**NORTH DALLAS DIAGNOSTIC CENTER, Appellant,**

v.

**Jacqueline Riley DEWBERRY, Appellee.**

**No. 05–92–00489–CV.**

Court of Appeals of Texas, Dallas.

April 13, 1995.

Rehearing Denied June 12, 1995.

Michael W. Huddleston, R. Brent Cooper, Cooper Huddleston & Aldous, P.C., Dallas, Teresa Bohne, Irving, and Brenda Neel Hight, Cantey & Hanger, L.L.P., Dallas, for appellant.

John K. Horany and David Rodriguez Weiner, Law offices of Windle Turley, P.C., Dallas, for appellee.

Before THOMAS,[1] C.J., and OVARD and MORRIS, JJ.

## OPINION

THOMAS, Chief Justice.

In this medical malpractice action, we must decide whether the trial court abused its discretion in allowing an expert to testify on causation without a showing that the expert's opinion was based on valid and well-grounded scientific knowledge. A jury found appellant North Dallas Diagnostic Center (the Center) liable for injuries sustained by appellee Jacqueline Riley Dewberry after she was injected with a contrast dye. On appeal, the Center raises eleven points of error challenging the trial court's judgment.

We conclude the testimony of Dewberry's expert witness on causation was not shown to be grounded in valid scientific knowledge; thus, the trial court abused its discretion in admitting the testimony. Because this was the only evidence of causation, we hold the evidence is legally insufficient to support the jury's findings of proximate cause. Accordingly, we reverse the trial court's judgment, and in the interest of justice, we remand for proceedings consistent with this opinion.

## FACTUAL BACKGROUND

In early 1988, Dewberry was experiencing headaches. In February, she consulted her obstetrician-gynecologist about a headache she suffered the previous weekend. Her gynecologist referred her to a neurologist, Dr. Worthy Warnack, Jr.

Dewberry saw Dr. Warnack on February 4, 1988, complaining of headaches, burning skin, bulging veins, and a "constellation of skin symptoms that she described." Dr. Warnack ordered a computed tomography (CT) scan[2] to help evaluate Dewberry's condition. Dr. Warnack told Dewberry the CT scan would involve injecting her with an iodinated contrast medium through an intravenous line placed in her arm.

Dewberry expressed fear of the iodinated dye. When Dr. Warnack asked if she had experienced a reaction to iodinated dye, Dewberry said she had not. After examining and questioning Dewberry, Dr. Warnack concluded there was no medical reason not to use iodine contrast medium in the CT scan. In his opinion, Dewberry was not allergic to iodine. Nevertheless, Dr. Warnack told Dewberry the CT scan would be performed without contrast medium, and he ordered the test without contrast medium.

On February 8, 1988, Dewberry went to the Center to undergo the CT scan. Although Dewberry told the technicians that Dr. Warnack ordered the test without contrast medium, the test was performed with contrast medium. Dewberry experienced a painful, burning reaction when the technicians injected her with the iodinated dye, Angiovist–282. Dewberry repeatedly complained to the technicians during the test. When the CT scan was completed, Dewberry noticed a knot in her arm where the contrast

---

1. The Honorable Linda Thomas was on the original panel at the time this cause was submitted for decision. Justice Thomas was sworn in as Chief Justice on January 1, 1995.

2. "Computed tomography (CT) is a form of radiography in which fan-shaped beams of x-rays are directed onto the patient from many different angles. At each angle, electronic sensors convert the x-rays transmitted through the patient to a digital form which can be interpreted by a computer. In the computer, the digital signals are reconstructed to yield an image of the patient's anatomy in cross-sectional and axial slices." 3a ROSCOE GRAY & LOUISE GORDY, ATTORNEYS' TEXTBOOK OF MEDICINE § 70.17 (3d ed.1994).

medium was injected. Additionally, the area was black and blue.

The following afternoon, Dewberry's headache became more of a burning headache than it had been before the CT scan. The next morning, she noticed her face was swollen, red, and burning. She also felt the burning she experienced during the CT scan.

Over the next two-and-one-half years, Dewberry saw several doctors about her complaints. None of these doctors diagnosed the cause as a reaction to the contrast medium. In August 1990, Dewberry went to Dr. Harvey Ross, a physician at the Environmental Health Clinic in Dallas. Based on his testing and treatment of Dewberry, Ross concluded that Dewberry's health problems were caused by an adverse reaction to the Angiovist–282.

Dewberry sued the Center, alleging the contrast medium caused a chronic and permanent reaction.[3] At trial, Dewberry complained of extremely sensitive skin, continual burning headaches, abnormal hair loss, developing scar tissue, dry and swollen skin, facial swelling, a change in her skin color, extreme sensitivity to light, burning in her rectal and groin areas, and running, swollen, burning eyes.

The jury found in Dewberry's favor on her claims for negligence and fraudulent misrepresentation and awarded her $205,000 actual damages and $260,001 punitive damages. The trial court also assessed prejudgment interest, postjudgment interest, and costs against the Center.

## ADMISSION OF EXPERT TESTIMONY

### 1. Preservation of Error

■ In the seventh point of error, the Center complains the trial court erred in admitting Dr. Ross's testimony because the testimony was based on neither accepted testing techniques nor a complete factual history of Dewberry. Dewberry counters that the Center's complaint has not been preserved for appellate review because the Center failed to object on the record. We disagree.

The Center's initial objections to Dr. Ross were not stated on the record. However, Dr. Ross was questioned outside the jury's presence on the reliability of his testing techniques. Because the trial court then ruled the Center's complaints went to the weight rather than the admissibility of the testimony, we conclude that the bases of the Center's objections were apparent to the trial court. *See* Tex.R.App.P. 52(a). Further, the Center did object in front of the jury to Dr. Ross's testimony on causation. Because we conclude the complaint was preserved for appellate review, we address the merits of the Center's argument.

### 2. Standard of Review

■ Preliminary questions concerning admissibility of evidence are determined by the court. Tex.R.Civ.Evid. 104(a).[4] This determination will not be overturned absent an abuse of discretion. *See Steenbergen v. Ford Motor Co.*, 814 S.W.2d 755, 760 (Tex.App.— Dallas 1991, writ denied), *cert. denied,* —— U.S. ——, 113 S.Ct. 97, 121 L.Ed.2d 58 (1992). Further, error may not be predicated upon a ruling that admits or excludes evidence unless a substantial right of the party is affected. Tex.R.Civ.Evid. 103(a).

■ The test for determining whether an abuse of discretion occurred is not whether the facts present an appropriate case for the trial court's action; rather, the test is whether the trial court acted without reference to any guiding rules and principles, or in other words, acted in an arbitrary and unreasonable manner. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986). The de-

---

3. Dewberry also sued the radiologist who interpreted the film during the test. The jury found in favor of the radiologist on those claims.

4. Rule 104(a) provides:
   (a) **Questions of Admissibility Generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.
   Tex.R.Civ.Evid. 104(a).

termination of whether a court abused its discretion is a question of law. *Jackson v. Van Winkle,* 660 S.W.2d 807, 810 (Tex.1983).

### 3. Rules Governing Admissibility

In making the initial determination of admissibility of evidence, Texas courts must apply the principles set forth in the rules of evidence governing relevancy. *See* TEX. R.CIV.EVID. 401–403. When the offered evidence is the testimony of expert witnesses, our courts must also apply the principles set forth in the rules governing expert testimony. *See* TEX.R.CIV.EVID. 702–705.

### Relevancy

Before evidence is admissible, it must be relevant as defined by rule 401. To meet the relevancy test of rule 401, the offered evidence must first have probative value; that is, it must logically tend to make a particular proposition more or less likely. Second, that proposition must be of consequence to some issue in the trial. *See* TEX.R.CIV.EVID. 401; *Service Lloyds Ins. Co. v. Martin,* 855 S.W.2d 816, 822 (Tex.App.—Dallas 1993, no writ).

In determining relevancy, we look at the purpose for offering the evidence. The relevancy test is satisfied if there is directly or by inference some logical connection between the fact offered and the fact to be proved. *See* TEX.R.CIV.EVID. 401; *Service Lloyds Ins. Co.,* 855 S.W.2d at 822. Although relevant, a trial court may nevertheless exclude evidence if its probative value is substantially outweighed by the danger of one of the factors set forth in rule 403.[5]

### Expert Testimony

Rule 702 of the Texas Rules of Civil Evidence governs the admissibility of expert testimony. The rule provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. TEX.R.CIV.EVID. 702.

■ The rule contains two hurdles that must be overcome before expert scientific testimony will be admissible. Proponents of expert testimony must establish: (1) that scientific, technical, or other specialized knowledge will aid the trier of fact; and (2) the expert witness is qualified to testify on the subject.

■ Under the first prong, an expert's opinion should be based on an existing body of scientific, technical, or other specialized knowledge that is pertinent to the facts in issue. *Thompson v. Mayes,* 707 S.W.2d 951, 956 (Tex.App.—Eastland 1986, writ ref'd n.r.e.). The test for admission of an expert's opinion is whether the underlying technical or scientific principle used by the expert is sufficiently reliable for the expert's testimony to assist the jury. *Gannett Outdoor Co. v. Kubeczka,* 710 S.W.2d 79, 89 (Tex.App.— Houston [14th Dist.] 1986, no writ); *Thompson,* 707 S.W.2d at 956. The intent of this test is obvious: if the opinion the jury considers to reach its verdict is unreliable, the risk of an erroneous verdict increases.

■ If the expert's field of knowledge does not have a scientific or specialized base, courts should exclude the evidence because the expert's opinion would be more likely to prejudice or confuse than to assist the trier of fact. *See Warren v. Hartnett,* 561 S.W.2d 860, 863 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.); *Thompson,* 707 S.W.2d at 956. For example, suit was filed in *Warren* to set aside a holographic will. At trial, the contestants put on a handwriting expert, who testified that, based on a handwriting comparison, the testatrix lacked testamentary capacity because she was an alcoholic. We refused to give the testimony any probative effect, reasoning that "we are aware of no recognized field of scientific inquiry which permits divination of mental capacity by persons whose

---

5. Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX.R.CIV.EVID. 403.

expertise is limited to handwriting analysis." *Warren,* 561 S.W.2d at 863.

Likewise, the *Thompson* court concluded the trial court did not abuse its discretion in excluding an expert's opinion because the opinion was not based on an underlying technical or scientific principle sufficiently reliable to aid the jury. *Thompson,* 707 S.W.2d at 956. Specifically, the trial court refused to allow a psychologist in a will dispute to give an opinion on whether a devisee "may have" killed his father. *Thompson,* 707 S.W.2d at 956. (The devisee later committed suicide, and his sister sought to impose a constructive trust on assets the devisee received under their father's will.) The psychologist's opinion was based on a "psychological autopsy" used to determine the brother's state of mind at the time the father disappeared. The court concluded there was no error, "especially after the expert conceded that he did not know of any other instance where a psychological autopsy had been used in this manner." *Thompson,* 707 S.W.2d at 957.

■ These cases recognize the principle that when a party offers expert scientific testimony, the trial court must make an initial determination of whether the scientific principle relied on by the expert is reliable and pertinent to the facts in dispute. Accordingly, we hold that when a party objects to proposed expert testimony on the ground of its reliability, a trial court, before admitting the testimony, must determine (1) whether the expert's opinion is based on valid and well-grounded scientific, technical, or other specialized knowledge, and if so, (2) whether the expert's opinion will aid the trier of fact. If the proponent of the expert testimony fails to establish these predicate facts, and the court nevertheless allows the testimony, the court has abused its discretion.

■ We note, at this point, that the difficult task is determining the threshold issue of whether an expert's knowledge is based on reliable principles. Texas civil case law provides little help in guiding a trial court's discretion when determining whether expert scientific testimony is admissible.[6] Because Texas law is generally consistent with federal law regarding expert testimony on causation, and because the wording of the applicable federal rules is identical to our own, we can confidently turn to the federal courts for guidance. In particular, we note the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

*Daubert* suggests that a trial court consider four nonexclusive factors when evaluating the reliability of scientific testimony: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the standards controlling a technique's operation; and (4) general acceptance in the scientific community. *Daubert,* —— U.S. at —— – ——, 113 S.Ct. at 2796–97.

■ Because we believe the *Daubert* factors are helpful, we adopt that nonexclusive list of factors for determining the reliability of scientific testimony. We emphasize, however, that trial judges are not limited to the *Daubert* factors alone; trial courts may consider other factors bearing on whether the scientific evidence is reliable.[7] In examining the bases of an expert's opinion, we note from the outset, as did *Daubert,* that trial courts should focus solely on the validity of principles and methodology underlying the testimony, not the conclusions generated. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2797. However, once a trial court determines the evidence is reliable and pertinent, and there-

---

6. The Texas Court of Criminal Appeals, however, has addressed this very issue. *See Kelly v. State,* 824 S.W.2d 568 (Tex.Crim.App.1992). The court listed seven nonexclusive factors that could affect a trial court's determination of reliability. *Kelly,* 824 S.W.2d at 573.

7. *See In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 n. 8 (3rd Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995) (suggesting other factors to consider: (i) the existence and maintenance of standards controlling the technique's operation; (ii) the relationship of the technique to methods which have been established to be reliable; (iii) the qualifications of the expert witness testifying on the methodology; and (iv) the nonjudicial uses to which the method has been put).

by relevant, the court must then balance the probative value of the evidence or testimony against the factors set forth in rule 403 of the Texas Rules of Civil Evidence.

We recognize our decision may require parties to develop more evidence at the preliminary *voir dire* examination of an expert for the trial court to perform its "gatekeeping" role. While that may involve more time and expense in the litigation process, it also provides necessary safeguards against admitting testimony ungrounded in scientific validation. With this in mind, we turn to the evidence presented during the *voir dire* examination of Dr. Ross to determine if the threshold predicate for admissibility was established.

### 4. Application of Law to Facts

Although Dr. Ross testified generally about the method of testing, *i.e.*, intradermal skin testing,[8] there was no testimony concerning the particular tests performed on Dewberry. Specifically, the *voir dire* examination of Dr. Ross contains no evidence of (i) the conditions under which Dewberry's tests were performed, (ii) the standards controlling the technique's operation or whether any such standards existed, (iii) who performed the tests, (iv) how the testing technique related to the substance, Angiovist–282, and (v) whether this particular type of testing has been performed in the past to determine sensitivity to contrast media. In essence, there was no evidence concerning this testing technique as it specifically related to Dewberry and her condition. Consequently, we conclude Dewberry failed to meet her burden at trial of establishing that Dr. Ross's opinion was based on valid and well-grounded scientific knowledge, and the trial court abused its discretion in admitting the testimony without such a predicate being established.

Having so concluded, we must next determine whether the erroneous admission of Dr. Ross's testimony on causation amounted to such a denial of the Center's rights as was reasonably calculated to cause and probably did cause rendition of an improper judgment. *See* Tex.R.App.P. 81(b)(1). We make

that determination by looking at the entire record to see whether the judgment was controlled by the testimony that should have been excluded. *Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 230 (Tex.1990).

It is undisputed that Dr. Ross was the only expert to testify that the injection of Angiovist–282 was the cause of Dewberry's condition. In fact, every other expert testified to the contrary. Without Dr. Ross's testimony, there is no evidence of causation on which to base a judgment. Because the judgment was controlled by Dr. Ross's testimony, the admission of his testimony was harmful error. Accordingly, we sustain the seventh point of error.

### LEGAL SUFFICIENCY CHALLENGE

In the first and third points of error, the Center complains the trial court erred in denying its motion for judgment notwithstanding the verdict because there was no evidence to support proximate cause on the negligence and misrepresentation causes of action.

### 1. Standard of Review

A no-evidence point is a question of law. In deciding that question, we consider only the evidence and reasonable inferences tending to support the finding and disregard all evidence and inferences to the contrary. *See Jacobs v. Danny Darby Real Estate, Inc.,* 750 S.W.2d 174, 175 (Tex.1988); *Glover v. Texas Gen. Indem. Co.,* 619 S.W.2d 400, 401 (Tex.1981) (per curiam).

A legal insufficiency challenge must be sustained when the record discloses one of the following:

- a complete absence of evidence of a vital fact;
- *the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove the vital fact;*
- the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or

---

8. Intradermal skin testing consists of injecting a diluted dose of a substance into the upper layer of a patient's skin. The patient is then watched

to see if the substance produces symptoms in the patient. Dr. Ross likened the procedure to an allergy test.

· the evidence establishes the opposite of a vital fact.

*Cecil v. Smith,* 804 S.W.2d 509, 510 n. 2 (Tex.1991) (emphasis added). *See* Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX.L.REV. 361, 362–63 (1960).

### 2. Application of Law to Facts

In a medical malpractice case, the plaintiff must prove, by competent testimony, that the defendant's negligence proximately caused the plaintiff's injury. *See Kramer v. Lewisville Memorial Hosp.,* 858 S.W.2d 397, 399–400 (Tex.1993); *Duff v. Yelin,* 751 S.W.2d 175, 176 (Tex.1988).

Dr. Ross's testimony was the only evidence that Dewberry's condition was proximately caused by the injection of Angiovist–282. We have determined that Dewberry did not establish that Dr. Ross's testimony was relevant and therefore admissible; thus, we are prohibited from considering it as evidence to support the trial court's judgment. *See Marshall v. Telecommunications Specialists,* 806 S.W.2d 904, 907 (Tex.App.—Houston [1st Dist.] 1991, no writ) (refusing to consider inadmissible hearsay in determining sufficiency of evidence on appeal); *Cottle v. Knapper,* 571 S.W.2d 59, 62 (Tex.Civ.App.—Tyler 1978, no writ) (refusing to consider admissible testimony in determining sufficiency of evidence on appeal); *Texas Dep't of Pub. Safety v. Nesmith,* 559 S.W.2d 443, 447 (Tex.Civ.App.—Corpus Christi 1977, no writ) (holding that incompetent evidence, although admitted at trial, should not be considered on appeal as having any probative value). Because we may not consider Dr. Ross's testimony in our legal sufficiency analysis, there is no evidence of causation. Accordingly, we sustain the first and third points of error.

This brings us to the question of what judgment this Court should enter. Generally, when a court sustains a no-evidence point, reversal and rendition are required. However, an appellate court may remand for a new trial when the case has not been fully developed and a retrial would better serve the

interest of justice. *See* TEX.R.APP.P. 81(c); *United States Fire Ins. Co. v. Carter,* 473 S.W.2d 2, 3 (Tex.1971) (per curiam); *Smith v. Drake,* 852 S.W.2d 82, 86 (Tex.App.—Waco 1993), *rev'd on other grounds, County of Alameda v. Smith,* 867 S.W.2d 767 (Tex. 1994) (per curiam); *First State Bank v. Keilman,* 851 S.W.2d 914, 931 n. 5 (Tex.App.—Austin 1993, writ denied).

In this case, the trial court's error resulted in Dewberry relying on a single witness to prove causation. With that in mind, we conclude the proper remedy in this case is a new trial that gives Dewberry a chance to introduce or fully develop evidence compatible with the standard set forth in this opinion. *See* William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 TEX.L.REV. 515, 527 (1991).

Accordingly, we reverse the trial court's judgment and remand the case for further proceedings consistent with this opinion.[9]

---

9. Because of our disposition of points of error one, three, and seven, we need not address the remaining points of error.